SIXTH DIVISION 

January 18, 2002

No. 1-01-0607

CHICAGO STEEL RULE AND DIE FABRICATORS 

COMPANY and TRAVELERS INDEMNITY COMPANY

OF ILLINOIS, as Subrogee of Chicago Steel Rule and Die

Fabricators Company,

Plaintiffs-Appellants, 

v.

ADT SECURITY SYSTEMS, INC.; ADT SECURITY 

SERVICES, INC.; and TYCO INTERNATIONAL LTD.,

Defendants-Appellees.

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

Philip L. Bronstein,

Judge Presiding.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiffs Chicago Steel Rule & Die Fabricators Co. (Chicago Steel) and Travelers Indemnity Company of Illinois (Travelers), as subrogee of Chicago Steel, brought this action against defendants ADT Security Systems, Inc., its successor corporation ADT Security Services, Inc. (ADT), and Tyco International, Ltd. (Tyco), to recover damages resulting from a fire that occurred at a plant operated by Chicago Steel.  This case presents an issue of first impression as to whether an exculpatory clause in a contract between two commercial parties can 
preclude one of the commercial parties from bringing property damage claims based on strict products liability.

On the date of the fire, ADT maintained a fire alarm system that it had previously
 installed at the Chicago Steel plant.  Plaintiffs alleged that the failure of the alarm system and/or ADT's failure to maintain and monitor the system caused a delay in notification to the Chicago fire department and resulted in substantial property damage
.  Their complaint included four counts: (1) strict products liability; (2) breach of contract; (3) negligence; and (4) gross negligence.  The plaintiffs allege property damage to property other than the alleged defective product (other property).  Tyco, ADT's parent company, was never served with process and is not a party to this appeal.  ADT filed a motion to dismiss plaintiffs' complaint, based in part upon an exculpatory clause contained in its fire alarm installation and maintenance contract with Chicago Steel which released ADT from future negligence, breach of contract, and strict liability claims.  The trial court granted ADT's motion, but gave plaintiffs leave to amend the gross negligence count included in their complaint.  Plaintiffs did not amend that count, and the trial court subsequently entered an order pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) finding that its prior dismissal order was final and that there was no just reason to delay its enforcement or appeal.  Plaintiffs now appeal the dismissal of their strict liability, negligence, and breach of contract counts, contending that the exculpatory clause was unenforceable.

BACKGROUND

On July 16, 1997, Chicago Steel entered into a contract with ADT pursuant to which ADT agreed to design, sell, install and/or maintain a fire alarm system, and provide fire alarm monitoring and reporting services  for Chicago Steel's plant at 6630 W. Wrightwood Avenue in Chicago.  Under the terms of the contract, ADT was to maintain the fire alarm system and inspect it four times per year.  Chicago Steel was to pay 
ADT $3,472 annually.

The contract stated ADT was not an insurer and would be exempt from liability for damage to property, whether based on breach of contract, negligence, or strict liability.  The contract also contained a limitation of damages clause limiting any liability on ADT's part to the greater of 10% of the annual service charge or $1,000.  The contract, however, gave Chicago Steel the option to pay for an allocation of additional liability to ADT.  The record reflects that Chicago Steel did not exercise that option.

On January 2, 1999, following the alarm system's installation, a fire occurred at the Wrightwood plant, causing substantial damage to property located there.  Chicago Steel submitted a fire damage claim to Travelers, its insurer.  Travelers paid the claim and thus became the subrogee of Chicago Steel.

In December 1999, plaintiffs filed their complaint against defendants.  The strict products liability count alleged that the alarm system was defective and unreasonably dangerous, failed to detect fire in the Chicago Steel plant, failed to adequately monitor water flow in the automatic sprinklers located in the plant, failed to signal ADT to notify the Chicago fire department of the fire and was otherwise inadequately designed, manufactured, sold, installed or maintained by ADT.  The breach of contract count and negligence counts both alleged that ADT "failed to design, manufacture, sell, install and/or maintain a system that would adequately detect fire," failed to adequately monitor water flow in the automatic sprinklers, and failed to notify the Chicago fire department of the fire upon receiving an alarm indicating that the automatic sprinklers had been activated.  ADT filed a motion to dismiss the complaint, contending that it failed to state sufficient facts to support its claims and contending, pursuant to section 2-619(a)(9) of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 1998)), that the exculpatory clause in the subject contract constituted an affirmative defense that barred plaintiffs' claims.

The trial court granted ADT's motion to dismiss, stating at the hearing on the motion that the exculpatory clause was a "good and proper exculpatory, arm's length agreement, [with] nothing to suggest otherwise, [and] no claim of unconscionability."  The court also stated that the exculpatory clause "forms the predicate for the obligations of the parties."  Based upon these findings, the trial court entered a written order dismissing plaintiffs' strict products liability, negligence, and breach of contract counts with prejudice pursuant to section 2-619(a)(9) of the Code. 

ANALYSIS 

Plaintiffs contend on appeal that the trial court erred by dismissing those three counts based on its conclusion that
 the exculpatory clause was enforceable and therefore constituted a valid affirmative defense.  
 Section 2-619(a)(9) allows dismissal of an action when "the claim asserted *** is barred by other affirmative matter avoiding the legal effect of or defeating the claim."  735 ILCS 5/2-619(a)(9) (West 1998).  Accordingly, we review the dismissal of plaintiffs' claims 
de novo
 as a matter of law.  
Kedzie & 103
rd
 Curency Exchange, Inc. v. Hodge
, 156 Ill. 2d 112, 116-17 (1993).

Contractual provisions releasing parties from future liability, commonly referred to as exculpatory clauses or disclaimers, are not favored in Illinois and are strictly construed against the party they benefit.  
Scott & Fetzer Co. v. Montgomery Ward & Co.
, 112 Ill. 2d 378, 395 (1986);
 
Harris v. Walker
, 119 Ill. 2d 542, 548 (1988).  However, such a provision will be enforced if: (1) it clearly spells out the intention of the parties; (2) there is nothing in the social relationship between the parties militating against enforcement; and (3) it 
is not against public policy.  
 
Harris
, 119 Ill. 2d at 548; 
Scott
, 112 Ill. 2d at 395.  The rationale supporting enforcement in Illinois of such provisions is the "broad public policy permitting competent parties to contractually limit their respective liability and to allocate business risks in accordance with their business judgment."  
Rosenstein v. Standard & Poor's Corp.
, 264 Ill. App. 3d 818, 826-27 (1993).

I. STRICT LIABILITY  

Plaintiffs contend that the provision within the exculpatory clause precluding the strict liability claim for property damage is unenforceable because it violates public policy.  Notably, plaintiffs do not argue on appeal that the language in the provision is ambiguous or reflects anything other than the intent of the parties to preclude the strict liability claim.  Indeed, the provision is clear.  It specifically states "ADT shall be exempt from liability for loss, damage, or injury due directly or indirectly to occurrences, or consequences therefrom, which the service or system is designed to detect or avert" and states that this exemption shall apply if the loss or damage to property results from "performance or nonperformance of obligations imposed by this contract," "negligence," or "strict liability."  Furthermore, plaintiffs do not argue that anything in their social relationship with defendants militates against enforcement of this provision.  Rather, relying primarily upon 
Sipari v. Villa Olivia Country Club
, 63 Ill. App. 3d 985 (1978), plaintiffs argue that the provision in the exculpatory clause is against the public policy in Illinois of protecting the general public.

Illinois courts have held that contractual provisions precluding consumers from bringing strict liability claims for personal injuries violate public policy.  See 
Sipari
, 63 Ill. App. 3d at 990-91;
 
Haley v. Merit Chevrolet, Inc.
, 67 Ill. App. 2d 19, 30 (1966).  However, our research indicates that no Illinois court has addressed the issue of whether a contractual exculpatory provision violates public policy by precluding a commercial party to the contract from bringing a strict liability claim to recover for damage to "other property" 
i.e.
, property other than the allegedly defective product.  In order to resolve this issue of first impression, we must first identify the public policy reasons that motivated this court in 
Sipari
 and 
Haley
 to preclude enforcement of strict liability disclaimers against consumers seeking to recover for personal injuries.  Then we must determine whether those same public policy reasons would require precluding enforcement of strict liability disclaimers against commercial entities seeking to recover for damage to property.

In 
Sipari
, a lessee of a golf cart brought a strict tort liability action against the lessor and the cart's alleged manufacturer for injuries he sustained when the cart overturned on him.  
Sipari
, 63 Ill. App. 3d at 986.  The defendant lessor argued that an exculpatory clause 
on the rental ticket relieved the lessor from liability.  
Sipari
, 63 Ill. App. 3d at 990.   The court rejected the defendant's argument, reasoning that strict liability is imposed by operation of law as a matter of public policy for the public's protection and that "the one liable cannot contract away his own responsibility for having placed a defective product into the mainstream of public use."  
Sipari
, 63 Ill. App. 3d at 990-91.

In 
Haley
, a car driver and her passenger brought an action against the manufacturer of the car, the car dealer, and the tire manufacturer for injuries they sustained when the driver lost control of the car because of an allegedly defective steering column and allegedly defective tires.  
Haley
, 67 Ill. App. 2d at 23.  The defendant car dealer argued that the terms of an express warranty given to the plaintiffs precluded its liability and limited its obligation to repair or replacement of parts in certain situations.  
Haley
, 67 Ill. App. 2d at 29-30.  The court disagreed, holding that the warranty provision violated public policy.  
Haley
, 67 Ill. App. 2d at 30.  The court reasoned that to allow the dealer to limit, by contract, its tort liability for defects in a car to repair or replacement of defective parts would defeat the public policy reasons which motivated the supreme court to adopt the theory of strict liability in tort for defective products in 
Suvada v. White Motor Co.
, 32 Ill. 2d 612 (1965).  
Haley
, 67 Ill. App. 2d at 30. 

In 
Suvada
, the supreme court adopted the theory of strict liability in tort for defective products, as set forth in section 402A of the Restatement (Second) of Torts (1965).  
Suvada
, 32 Ill. 2d at 621.  Strict liability under section 402A is imposed upon "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property." Restatement (Second) of Torts section 402A (1965).  In 
Suvada
, the supreme court concluded that in order to recover on a theory of strict liability in tort for defective products, plaintiffs "must prove that their injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control."  
Suvada
, 32 Ill. 2d at 623.  The policy reasons articulated in 
Suvada
 that motivated the supreme court to adopt the theory of strict liability included: (1) the public interest in human life and health; (2) parties who induce the use of a product through advertising represent to the public that it is safe and should be liable for damage caused by that product; and (3) the justice of imposing the loss on the one creating the risk and reaping the profit by placing the product in the stream of commerce.  
Suvada
, 32 Ill. 2d at 619.  This principle has been interpreted to include "all persons in the distributive chain" of a defective product.  
Hammond v. North American Asbestos Corp.
, 97 Ill. 2d 195, 206 (1983).

The first public policy reason 
motivating the holdings in
 
Suvada
, 
Sipari
, and 
Haley
 - the public interest in human life and health - reflects the public policy in Illinois of protecting the physical health and safety of its citizens.  Although the above decisions did not expressly state how enforcing clauses precluding strict liability claims would compromise the physical health and safety of the public, their implicit reasoning is obvious.  Permitting commercial entities to enforce such provisions against consumers would minimize their exposure to strict products liability arising from personal injuries and thus diminish their incentive to produce and introduce into the stream of commerce reasonably safe products.  The supreme court, in a discussion of the policy considerations underlying the theory of strict liability in tort
, has recognized the validity of this reasoning.  See 
Trans States Airlines v. Pratt & Whitney Canada, Inc.
, 177 Ill. 2d 21, 38-39 (1997) (noting that possibility of strict products liability claims by consumers with personal injuries motivates manufacturers to create safe products; eliminating this possibility, through contract or otherwise, would diminish their incentive to build safe products and potentially threaten public safety).

The second and third policy reasons articulated in 
Suvada
 for adopting the theory of strict products liability and relied upon in 
Haley
 are that  commercial entities should be held liable when they represent to the general public that their products are safe and then reap profit by selling unsafe  products to the general public.  That public policy aims to discourage commercial entities with superior bargaining power from shifting the risk of loss arising from unreasonably safe products to individual consumers with inferior bargaining power.  As the supreme court noted in 
Trans States Airlines
, the adoption of strict products liability in Illinois was generated not only from safety concerns, but also from the concern that consumers and remote parties were not on equal footing with the manufacturer or seller to bargain effectively for the allocation of risk.  
Trans States Airlines
, 177 Ill. 2d at 39.  

The question before us is whether under a contract entered into between two commercial entities, enforcement of a strict liability disclaimer against one of the commercial parties to the contract seeking to recover for damage to 
other property would be inconsistent with or violate public policy.  We conclude that allowing enforcement of the provision at issue 
would not violate public policy.  In the context of this case, we do not believe that enforcing an exculpatory provision relieving a commercial party to the contract from strict liability based on damage to other property would threaten the public's physical safety by diminishing the incentive to manufacture and/or distribute safe products.  Manufacturers and distributors would still be subject to strict products liability actions brought by remote parties and individual consumers who suffered personal injuries or property damage.  Potential liability under such actions, in monetary terms, could be extremely high.  Therefore, the incentive to manufacture and distribute safe products would remain.

We do not believe that enforcement of exculpatory provisions barring commercial parties to the contract with equal bargaining power from bringing strict liability claims for damage to other property would conflict with a public policy concern which aims to ensure that third parties not in privity of contract or consumers with inferior bargaining power are not forced to unwittingly accept the risk of loss arising from unreasonably safe products.  As the supreme court has noted, this policy concern is not implicated when commercial entities with equal bargaining power enter into a contract which clearly allocates the risk.  
Trans States Airlines
, 177 Ill. 2d at 39.

Chicago Steel does not argue that it possessed inferior bargaining power when it entered into the contract in question.  Chicago Steel does not suggest that ADT was the only provider of alarm systems or that ADT had a monopoly on alarm design, maintenance, and installation services.  The exculpatory clause itself stated that "if [Chicago Steel] desires ADT to assume greater liability, ADT shall amend this agreement by attaching a rider setting forth the amount of additional liability and the additional amount payable by the customer for the assumption by ADT of such greater liability ***."  This language indicates that Chicago Steel had the option to further negotiate the risk of loss arising from damage to other property.  The record reflects that Chicago Steel did not exercise that option.  Chicago Steel is a commercial entity and there was no evidence of disparity in the bargaining power of the parties to the contract.

Based on the facts of this case, we find that an exculpatory clause which specifically precludes strict products liability claims for damage to other property does not violate public policy when (1) the parties to the contract are commercial entities of equal bargaining power; (2) it is invoked against a commercial entity that is a party to the contract in question; (3) the exculpatory clause is clear and unambiguous; (4) there is no evidence of fraud or duress; (5) there is no legislative directive to the contrary; (6) there is nothing in the relationship of the parties militating against enforcement; and (7) the damage at issue is to the other property of one of the commercial parties to the contract.  
Accordingly, we conclude that enforcement of the exculpatory provision precluding plaintiffs' strict liability claim does not conflict with the public policy rationale supporting the holdings in 
Sipari
 and 
Haley
 and does not violate the public policies identified in those cases.  We find Chicago Steel was not unjustly compelled to accept the risk of loss for damage to its property.  W
e hold that the exculpatory provision in the contract  was enforceable and constituted a valid affirmative defense.    We note that our holding is consistent with those of numerous other jurisdictions.  See, 
e.g.
, 
Keystone Aeronautics Corp. v. R.J. Enstrom Corp.
, 499 F.2d 146, 149 (3
d Cir. 1974) (Pennsylvania law allows clearly expressed and freely negotiated waiver of strict liability between business entities of relatively equal bargaining strength); 
Idaho Power Co. v. Westinghouse Electric Corp.
, 596 F.2d 924, 928 (9
th Cir. 1979) (disclaimer of strict liability between two large corporations of equal bargaining power is enforceable); 
McDermott, Inc. v. Clyde Iron
, 979 F.2d 1068, 1076 (5th
 Cir. 1992), (contractual provisions waiving strict liability claims are enforceable under New York law), 
rev'd
 
&
 
remanded
 
on
 
other
 
grounds
, 511 U.S. 202, 128 L. Ed. 2d 148, 114 S. Ct. 1461
 (1994); 
Leon's Bakery v. Grinnell Corp.
, 990 F.2d 44, 50 (2
d Cir. 1993) ("a contractual limitation of liability with respect to a device alleged merely to have failed to detect or impede fire may be enforced against a claim of strict liability" under Connecticut law); but see 
Sterner Aero AB v. Page Airmotive, Inc.
, 499 F.2d 709, 713 (10
th Cir. 1974) (Oklahoma law prohibits disclaimer of strict tort liability, even in commercial transactions).

II. NEGLIGENCE AND BREACH OF CONTRACT

Plaintiffs next contend that the provisions of the exculpatory clause barring ADT from bringing negligence and breach of contract claims should not have been enforced because the exculpatory provisions are inconsistent with the public policy reasons articulated by the supreme court in 
Suvada
 and thus violate public policy.  In support of the public policy argument that ADT should not be able to exculpate or limit its damages under the negligence or contract claims, Chicago Steel relies upon 
Braden v. Honeywell, Inc.
, 8 F. Supp. 2d 724 (S. D. Ohio 1998).

In 
Braden
, the plaintiffs contracted with Honeywell for the installation of a home fire and burglar alarm system.  
Braden
, 8 F. Supp. 2d at 724.  At issue was the application of an exculpatory clause.  
Braden
, 8 F. Supp. 2d at 726.  Chicago Steel recognized that the 
Braden
 court in its analysis noted the split in Ohio authority regarding the validity of contractual provisions waiving the right to damages or limiting the amount of damages in alarm system contracts.  
Braden
, 8 F. Supp. 2d at 727-28.  However, the 
Braden
 court found the exculpatory provision was unenforceable because it would render the contract "manifestly unconscionable and unreasonable."  
Braden
, 8 F. Supp. 2d at 729.  We find 
Braden
 distinguishable.  The plaintiffs in 
Braden
 were individual consumers, not commercial entities.  Moreover, the equal bargaining strength of the commercial parties in this case together with the freedom of such parties  to allocate risk of loss undermine the argument of Chicago Steel that the 
Braden
 rationale should apply.

Here, the exculpatory provision was clear and explicit.  The contract gave Chicago Steel the option to pay for an allocation of additional liability to ADT.  Chicago Steel chose not to exercise this option.  The record does not demonstrate an absence of meaningful choice by one of the parties.  We find nothing unreasonable about the fact that the commercial parties of equal bargaining power were free to allocate the risk of loss by contract.

Moreover, we find instructive the Illinois cases which address exculpatory clauses that preclude negligence and breach of contract actions for damage to other property. 
 In the context of negligence and breach of contract claims, this court has previously reviewed exculpatory provisions similar to the one in this case and found such provisions did not violate public policy.  See, 
e.g.
, 
First Financial Insurance Co. v. Purolator Security, Inc.
, 69 Ill. App. 3d 413, 417-18 (1979) (clause in contract for maintenance of burglar alarm system that precluded negligence and breach of contract actions for damage to other property did not violate public policy);
 
North River Insurance Co. v. Jones
, 275 Ill. App. 3d 175, 179-82 (1995) (clause limiting damages for negligence arising out of the performance of fire alarm installation and maintenance contract enforceable and not violative of public policy).  In determining whether an exculpatory clause was enforceable, this court reviewed whether: (1) the terms in the clause were clear and precise; (2) there was evidence of fraud or oppression; (3) there was a legislative directive to the contrary; and (4) a special social relationship of a semi-public nature existed between the parties.  
First Financial Insurance Co.
, 69 Ill. App. 3d at 417-19. 

Our decision in 
North River Insurance Co.
, involved facts analogous to those in this case.
  In 
North River Insurance Co.
, a fire alarm service provider entered into a contract with the plaintiffs' insureds to furnish, install, and provide maintenance for a fire alarm system in a building where the insureds' business was located.  
North River Insurance Co.
, 275 Ill. App. 3d at 176-77.  The clause at issue stated that the alarm service provider was not an insurer and would not be liable for any damages to the insureds' property "'caused by performance or non-performance of obligations imposed by this contract or by negligent acts or omissions by [the alarm service provider].' "  
North River Insurance Co.
, 275 Ill. App. 3d at 177.  The contract also contained a limitation of damages clause which provided that if the alarm service provider was found liable for property damage based on breach of contract or negligence, its liability would be limited to $250.  
North River Insurance Co.
, 275 Ill. App. 3d at 178.  Although the contract gave the insureds the option to pay for an allocation of additional liability to the alarm service provider, they declined to exercise the option.  
North River Insurance Co.
, 275 Ill. App. 3d at 177. 

After the alarm system was installed, a fire occurred at the insureds' business.  
North River Insurance Co.
, 275 Ill. App. 3d at 178.  The plaintiffs brought a negligence action, alleging that the system failed to function during the fire and caused significant damage and loss to the insureds' property and its contents.  
North River Insurance Co.
, 275 Ill. App. 3d at 176.  The trial court entered summary judgment in favor of the alarm service provider, ruling that the limitation of damages clause was enforceable.  
North River Insurance Co.
, 275 Ill. App. 3d at 179.

On appeal, the reviewing court upheld the damage limitation.  
North River Insurance Co.
, 275 Ill. App. 3d at 180-81.  The court emphasized the absence of legislation barring fire alarm installation and monitoring companies from contracting for a limitation on damages occurring after installation of their alarm systems.   
North River Insurance Co.
, 275 Ill. App. 3d at 180-82.  The court also noted that it had previously rejected the argument that there was something in the social relationship between alarm services providers and commercial entities who contract to receive their services which militated against upholding exculpatory provisions or damage limitation provisions in their agreements.  
North River Insurance Co.
, 275 Ill. App. 3d at 181.

Like the contract in 
North River Insurance Co.
, the contract in this case provided that an alarm service provider (ADT) was to install and maintain a fire alarm system on behalf of a commercial entity and included an unambiguous exculpatory clause precluding negligence and breach of contract claims and limiting damages.  
Plaintiffs have not alleged evidence of fraud or oppression.  and have not identified any statute enacted by the legislature in the wake of 
North River Insurance Co.
 reflecting an intent to preclude enforcement of exculpatory clauses similar to the one at issue in this case.  We recognize that the portion of the clause on appeal in 
North River Insurance Co.
 was the damage limitation provision rather than an exculpatory provision barring negligence and breach of contract claims.  We note, however, that the rationale for enforcing both types of provisions is the same and the same criteria are applied when reviewing such provisions.  See 
North River Insurance Co.
, 275 Ill. App. 3d at 180-82 (relying upon same factors and freedom of contract principles applied in
 
First Financial Insurance Co.
, which upheld a provision in a burglary alarm system contract barring negligence and breach of contract claims).

Plaintiffs do make a policy-based argument that was not directly addressed in 
North River Insurance Co.
  They contend that enforcement of a negligence disclaimer in a fire alarm services contract affects not only the respective parties to the contract, but also the public at large.  Plaintiffs argue that the failure of a fire alarm and monitoring system could result in an uncontrolled spread of fire, causing significant loss of life and property.  Implicit in plaintiffs' argument is the assumption that fire alarm companies that design, install, and monitor fire alarm systems will have a diminished incentive to provide nonnegligent installation and monitoring services if they are able to minimize their potential liability by enforcing clauses barring negligence actions for damage to other property.  Based on this reasoning, such a diminished incentive would increase acts of negligence and ultimately threaten the physical safety of adjacent owners and their property.  We disagree.  Enforcement of negligence and breach of contract disclaimers will not give fire alarm installation and monitoring companies such as ADT a diminished incentive to perform their obligations under the contract in a nonnegligent fashion.  Such companies could still be exposed to negligence claims by third parties who sustain personal injuries or damage to property.  See 
Scott & Fetzer Co.
, 112 Ill. 2d at 391.    In 
Scott & Fetzer Co.
, a fire alarm service provider entered into a contract with Montgomery Ward (Wards) to install and maintain a fire warning system in a warehouse occupied by Wards.  
Scott & Fetzer Co.
, 
112 Ill. 2d at 382.  The contract included an exculpatory provision that precluded the provider's liability " 'for loss or damage due *** to occurrences, or consequences therefrom, which the service is designed to detect or avert.' "  
Scott & Fetzer Co.
, 
112 Ill. 2d at 384.
  Following installation of the system, a fire began in the portion of the warehouse occupied by Wards and spread to portions of the warehouse occupied by adjacent tenants.  
Scott & Fetzer Co.
, 
112 Ill. 2d at 382-83.
  The adjacent tenants brought a negligence action against Wards and the alarm service provider alleging that their negligence caused the fire to spread into their portion of the warehouse and destroy their inventory.  
Scott & Fetzer Co.
, 
112 Ill. 2d at 384-85.
  The trial court dismissed the complaint brought by the tenants, finding that their losses were purely economic and could not be recovered in tort.  
Scott & Fetzer Co.
, 
112 Ill. 2d at 385-86.

On appeal, the reviewing court reversed the dismissal of the tenants' claims against the alarm service provider, finding that the economic loss doctrine did not bar the tenants' action and that the allegations in the tenants' complaint were sufficient to establish that the alarm service provider owed a duty to them.  
Scott & Fetzer Co.
, 
112 Ill. 2d at 386-87.  
The supreme court affirmed the reviewing

court's decision, rejecting the alarm service provider's argument that it did not owe a duty to the adjacent tenants to guard against the losses they sustained.  
Scott & Fetzer Co.
, 
112 Ill. 2d at 387.

In support of its holding, the supreme court reasoned that where inspections relating to safety are involved, " '[a] defendant's liability for the negligent performance of its undertaking *** extends *** to such persons as defendant could reasonably have foreseen would be endangered as the result of negligent performance.' "  
Scott & Fetzer Co.
, 
112 Ill. 2d at 389-90, quoting 
Nelson v. Union Wire Rope Corp.
, 31 Ill. 2d 69, 86 (1964).  The supreme court additionally noted that the exculpatory clause in the contract between Wards and the alarm service provider did not operate to bar or limit the rights of the adjacent tenants.  
Scott & Fetzer Co.
, 
112 Ill. 2d at 391.  
Like the alarm service provider in 
Scott & Fetzer Co.
, ADT could be exposed to negligence claims by third parties not in privity of contract who sustained injuries or damage to property as a result of ADT's negligence in maintaining and monitoring the alarm system that it installed at Chicago Steel's plant.  Therefore, enforcement of such disclaimers will not give alarm companies a diminished incentive to perform in a manner which is not negligent.

CONCLUSION 

Finally, we note that although the court in 
North River Insurance Co.
 only stated generally that the principle of freedom of contract supported enforcement of exculpatory provisions in alarm system contracts (see 
North River Insurance Co.
, 275 Ill. App. 3d at 180), other jurisdictions have articulated specific policy reasons that support 
enforcement of terms precluding or limiting the liability of alarm system companies.  For example, the United States Court of Appeals for the Second
 Circuit has reasoned:

"The supplier of [a fire alarm system] is paid for its equipment and services, and the price does not generally include a sum designed to anticipate the possible need to pay the purchaser the value of the property that the system is to protect.  The owner or custodian of the property is in a far better position than the alarm system seller to know the property's value and to bargain with an insurance company for appropriate coverage and an appropriate premium, and, as the New York Court of Appeals noted, the alarm seller's 'limitations on liability help keep alarm services affordable.' "  
Leon's Bakery, Inc.
, 990 F.2d at 49, quoting 
Sommer v. Federal Signal Corp.
, 79 N.Y.2d 540, 554, 583 N.Y.S.2d 957, 962
, 593 N.E.2d 1365, 1370
 (1992).

We agree that property owners are in a better position than the alarm company to know the value of their property and bargain for appropriate insurance coverage.  Freedom of contract allows
 
commercial parties to use their business judgment to exculpate claims for liability in exchange for lower cost.  Under the type of exculpatory clause at issue in this case, requiring an alarm company to assume the risk of loss for damage to the property of the other commercial party to the contract
 
 could lead to substantial increase in the cost of providing alarm services and potentially reduce the number of property owners who could afford such services.  Such a result would obviously not be in the public interest.

For the reasons previously discussed, we affirm the judgment of the circuit court.

Affirmed.

GALLAGHER, P.J., and BUCKLEY, J., concur.